The writ issued 21th of January, but the hearing was postponed under an arrangement with Col. Peter Mallett, Commandant, &c., in order to have a full argument. In August, 1862, the petitioner being conscripted put in a substitute — the substitution has been adjudged valid. The case, then, depends, oh'the question, had Congress power to pass the Act conscripting men who have put in substitutes ? The power of a judicial tribunal to declare an act of Congress unconstitutional, when it is necessary to decide the question, in order to dispose of a case properly constituted before it is settled. Acts of Congress not unfre-quently involve questions purely legal — and the wisdom of giving this jurisdiction to the judiciary, is manifest; for besides the advantage of having such questions passed on, by those who have not become heated in the arena of politics-; there is this further consideration ; members of Congress are not elected because of their supposed knowledge oflaw, and those who have not devoted themselves to the science, however able they may be as statesmen, or eloquent as orators, are not presumed to be as good judges of law. as men who have made it “ a life-time study.” The courts, however, always presume an act to be constitutional, and do not declare it void, except on the clearest conviction. Where, as in this instance, a dry question of the common law is involved, the Judge is “ more at home,” and feels less embarrassment in dealing with the subject, than when the question depends solely on the construction of the Constitution, as in questions'of constitutional law, the province of the Judge and that of the statesman frequently run so nearly together as to make it difficult to distinguish the dividing line.
*426 The power of Congress depends on the question, 1st. Is substitution a contract? 2. Has Congress power to violate it own contract ?
1st. Is substitution a contract ? This' is a dry question of the common law and should be considered without reference to politics. There are parties capable of contracting -; there is a thing to he the subject of contract, so I suppose the only question that can be made is as to the consideration. i£ Grain to one and loss to the other party, is a legal consideration.” See Coggs vs. Bernard, and the cases cited in “ Smith’s Lead Cases.” If I lend one my horse to ride to Salem, and he felices him and starts, I am not at liberty to follow on and take the horse from him ; it is a contract-of bailment, although done merely for his accommodation. If you agree to carry a package for me to Salem, and start with it, I can maintain an action for breach of contract, should you be guilty of gross negligence, although I was to pay nothing, and it was purely for ■ my accommodation ; your undertaking to carry it, and my confiding it to you, is a consideration. So, if you fancy my horse, and I tell you I will not sell, but to gratify you I agree to let you have him il you will let me have a's good a horse, and thq exchange be made, title passes bj “contract executed,” just as if you had paid me the price in money. So, it you are bound to work for me three years at wages, and for your accommodation -I agree to discharge you, in consideration of $500, and the money is paid, or if I agree to discharge you in consideration of your putting another man to work in your place-, and it is done, there is in either case a contract executed, and it can make.no difference, whether you pay me the money with which I may get another man to supply your place, or whether you pay the money to the other man, and he takes your place. This is substitution. Really, the fact that it is a contract seems too plain for dis *427 cussion ; it is neither more nor lap than an exchange or “ swap,” as it is commonly circled. The government agrees to discharge a man in consideration of his putting a sound able-bodied man in his place, and it is done ; this is a valid contract.
It is true, substitution is “ a privilege,” but it is a privilege offered at a stipulated price, which is paid! So it is a privilege paid for, and that makes it'a contract, and distinguishes it from an exemption, and because of this distinction it is made a distinct clause in the conscription act, and is not put in the exemption act. Suppose Congress' was induced to enter into the contract of substitution in reference to conscripts, in order to naqke conscription more palatable to the people, and as a means- of relief in cases, of unequal hardship, and in reference to volunteers, the Secretary of War was induced to allow it in order to relieve some, who, in a moment of enthusiasm., hqd entered the ranks, and af-terwards found the service too hard for them, or suppose the inducement was that o.ur citizens might procure able-bodied,men from Ireland or Germany, and put them in the ranks as substitutes, while the citizen staid at home and raised fojd and 'clothing, “ there is ” no principle of' law, by which the inducement «can .change the nature of the transaction or take from- it the character of a contract. You are by the terms of the contract,' to furnish a sound, able-bodied man, and you do so ; that is the consideration: one man is taken for the other, 'just as in an exchange for 'horses, one horse is the consideration for the other ; and the fact that it- is made for the gratification or accommodation of one of the parties, does not in any way effect the legal question.
The ground that substitution isa “ mere privilege,” is' that taken in the President's Message and in the debates in Congress, and was the point mainly relied on by Mr, Kit- *428 trell and Governor living in their able and learned argument on the part of the government. For this reason I have given to it the most anxious consideration; and feel fully convinced, that although substitution is a privilege, yet, as by the agreement, it was to be paid for, and the stipulated price has been paid and accepted, it is, to all intents and purposes, an executed contract according to the common law,
It is said Congress will not be presumed to have made a contract by which to deprive the government of the services of those men during the war. • Allow such to be the presumption, it is rebutted by direct evidence. Congress has agreed to the contract of substitution in plain and unequivocal words, so as to leave no room for construction or doubt.
Again, it is suggested, -‘the manufacturer is exempt upon the condition that he will dispose of his fabrics at 'rates not higher than 15 per cent, added to the cost of production, he promises to manufacture and sell at the reduced price — here is a privilege paid for." A condition is annex-i-d to a gratuity, gift or sale, by which it. may he defeated; a consideration forms apart of ike contract itself; *this is the distinction. But, it is true, they sometimes run into each oiher, and the condition may constitute a consideration, /when, from the words used, that appears to he the intention. Whether this be the case in regard to that class of exemptions, in which a condition to work at certain rates is imposed on mechanics, is a question not presented ; for, take it to be so, it will only add to the list of contracts which Congress has entered into; unless an exemption be made on the ground that this is granted merely as an exemption, and no plain and unequivocal words of contract are used, as in the case in regard to substitution. It certainly has not the weight of an argument in absurdmi, and *429 that is tbe only point of view in which it can have any bearing. . . ’ •
It is also suggested, ‘ ‘ a blacksmith, who' has enlarged his business in consequence of his exemption, may say he cannot rightfully be disappointed. A similar argument was urged by Mr. Webster, to justify his change of opinion on the subject of the tariff. He said the New England States had engaged in manufacturing on the faith of the action of the government in passing the'tariff, and they, therefore, had a right to have their, manufactures protected.” The case of the blacksmith, like that of the tariff, presents simply a political question — -shall the government disappoint a reasonable expectation' based on its prior action? — not a dry question of law. Mr. Webster, in his speech, puts it'on the political ground, and no where intimates that the prior action of the government amounted to a valid, legal contract. One may have reason to expect a legacy and complain, should he be disappointed , but he has no legal claim, because there is no contract.
2d. Has Congress power to violate its own contract?
The power of Congress is limited by a written Constitution. It has no power except what is conferred by that instrument-, and it contains no such power, either expressed or implied. Indeed, it is excluded, for the power to make contracts, for instance, “to borrow money on the credit of the Confederate States,” if there be also power to violate it, would be nugatory. No government can have power to -violate its own contract, ^except under the rule, “might makes right. ” The power to violate its own contract, or, in other words, the right of “ repudiation,” has never been claimed by the Confederate States, and I had supposed it-was conceded by all that it did nojj have the power., But I am asked, “ cannot the Confederate States, in a-case of extreme necessity, violate its own contract — mot with refer- *430 «nee to morals, but to the supreme power of the government — and has the government of the Confederate States less, aiid if less, how much less, power than other governments in a ease of extreme necessity ? ”
The other governments referred to, have no written Constitution, and may act on thp broad and arbitrary rule, “ the safety of the State is the supreme law but the Confederate States has a written Constitution, which all officers are sworn to support. This Constitution and laws made in pursuance thereof, is “ the supreme law.’' The Constitution being written, can neither bend or stretch, even in a case of extreme necessity. It is not only written and supported by oaths, but so extreme was the caution *of its framers as to provide, “.all powers not herein delegated to the Confederate States, or prohibited to the States, are reserved to the States respectively.” In some few instances, large' powers are conferred to meet extreme cases, for instance r the power to suspend the writ of habeas corpus, “ where in cases of rebellion or invasion, the public safety may require it,” thus excluding, even in a case of “ extreme necessity,” any power other than' those “ nominated in the bond.”
Again, I am asked, “ admit substitution to be a contract, the power of'Congress is limited by a written Constitution, whore is the power to make a contract of substitution, by which the government gives up its right to the services of able-bodied citizens, for the public defence in a case of extreme necessity,.conferred by the Constitution, either in "express words or by implication? the word substitution is not to be found in that instrument.”
In reply, I might ask, is the word conscription to be found in the Constitution ? This is a Yankee mode of meeting one question'by asking another, which the gravity of the subject, forbids. I prefer to meet the question squarely, because I appreciate the motive which prompted it, and *431 •ecognize it as fair reasoning. The power to conscript is ¡upposed to be conferred by “ the power to raise armies ” n connection with the general authority, “ to pass all laws vhich shall be necessary and proper to carry that power nto effect, and in adopting the means to raise an army by inscription, it follows that Congress has power to modify ¡he means in such manner as to make it injure the public is little as possible, and to produce as great collateral beue-it as possible ; in other words, to modify conscription by ¡blowing substitution, so as to make it answer the purpose >f raising an army, and at the same time relieve, in cases >f unequal hardship, and collaterally benefit the public by iroviding the means, whereby the citizen might be left at iome‘ to raise food and clothing for the soldiers and “ thus vpport the ,army ” at the same time, that,the full comple-ue'nt of soldiers was kept up by substitute's brought from ¡broad, or found among those who were not liable to mili-ary service. Suppose Congress, in its wisdom, had re-primí, as the consideration for substitution, that tw$ able-todied Irishmen or German should be put in the place of he citizen, would it have occurred to anyone that thepow-r to conscript did not necessarily include the power to ,llow substitution on such terms ? the greater includes the ess. And it will be remembered that substitution is not a lew thing ; it is prominent, and. taken- to be a matter of ourse in all prior legislation, both in this country and in Sngland. Where “the militia” is looked on as a mode f defence in cases of invasion or rebellion,, and where con-cription was made to take the place of the militia organi-ation, as a matter of course it was, accompanied by this comment feature.
Mr. Kittrell, on the argument, treated the subject in a ifferent light. He assumed substitution to be a contract, ut insisted Congress had no power to make that particular *432 sort of contract, on the ground, that it would be “ politics Suicide, for, said he, “ if Congress has power to deprive th country by its contract of the services of 1000 of its citizens it may extend it to 100,000, and 500,000, and so we woul have no citizen soldiers!” Whether it would amount i “ political suicide ” to have a condition of things in whie 500,000 Irishmen and Germans would be in the army, t fight our enemy^-while a corresponding number of citizen were at home raising food and clothing, and' paying tax< to support this army, is a question into which a Court: not at liberty to enter. I will observe that this mode ( reasoning, by supposing extreme cases, is not apt to lead i ,truth, and is very apt to ■ cover fallacy, (as it manifest! does in this instance,) for., allow that in the extreme cae put, it would be political suicide, does it prove a want < power, or an abuse of power P T.hat's the question, I Congress has the power, whether it will so exercise it, s to commit suicide, or to stultify Itself is a matter wit which the Courts have no concern, and a proper respect for co-ordinate branch of the government forbids the judiciar from making an extreme supposition, in order to express conjecture, how far a power may be so abused as to avoi ■ it, and require .the Courts to say it shall not be exercisec under that head of jurisdiction, by which the Courts pr< vent mad-men or idiots from injuring themselves or ic was ing their substance.”
Congress has power to borrow money on the credit of th Confederate States. It has, (I believe,) borrowed fiftee millions, and pledged the export duty on cotton. It ha power to do so, as a means necessary and proper tu enab it to borrow the money. Run out this reasoning, by suj posing extreme eases. Congress borrows 150 millions mor< and pledges the export duty on tobacco ; it then borrows 150 billions and pledges all export and import duties, an *433 11 money that may be raised by direct taxation ; this might e political suicide or stultification, and áfter the money ia pent, the government would have “ no assets, ” and no leans of raising any, but,will any one: venture to aver, on his reasoning, that Congress had no power to borrow the fteOn millions and pledge the export duty on cotton ? The nnouncement of such a proposition would startle the oom-nercial world.
Take a case near home : Gk>v, Morehead proposed a plan ly which to enable the government to borrow 400 millions, n consideration, among other things, that the bonds should lot at any time be liable to taxation, thereby withdrawing hat amount of the wealth of our citizens. from liability to mpport the government ini all time to come. Many said.it vould be unwise in CongB|§k to withdraw that amount from .iability to taxation, but no one ever suggested that Congress did not have power to make the contract; and yet mother Kittrell might run out his mode of reasoning, shas ;o show that Congress might in this manner abuse it* power and reduce itself to absolute beggary ; ergo, Congress did not have the power '.
It is gratifying, however, in knowthat I. am not under the necessityof relying on my own judgment in deciding this question. The “ inviolability " of a contract, whether made by the Confederate'States, or the State, or an individual, is uniformly upheld by the decisions of our Supreme Court in a tone of firmness that is gratifying to every one; Search from Haywood’s reports to Jones’ and yon'will no where me*, f.do.u-'on, or a Jó i.u.f wan Intimation,'that the State baa power to violate its own contract, or to avoid' or repudiate it, on ihe ground that the power has been or might be abused. To mention a few: State vs. Matthews, 3 Jones, 451, where the Court say, if the State has made a contract, allowing the bank to issue “ one dollar r.cJ«:? “ in *434 so many words, tbe State is bound-; McRee vs. Wilmington and R. R. R., 2 Jones, 186, where the Court say, “ if1 the charter grants the monopoly, and the railroad bridge or structure comes within the meaning, it is a contract, and the State is bound, unless the effect of the' revolution ■ and our bill of rights was to introduce a new order of things and avoid all such - monopolies; ” Attorney General vs. Bank of Charlotte, 4 Jones’ Eq., 287, where it is decided, ‘ ‘ where a price is stipulated in the grant of the charter it is the consideration for which the sovereign makes the grant and cannot be increased; to levy a tax on the bank is to add to the stipulated price, and, therefore, an act of the Legislature imposing such a tax is in violation of the Constitution and void.” Here is a i%¿ng withdrawn from the power of taxation by force of a contract. .
I have heard some express the opinion that it would have been better not to have made a Constitution for the Confederate States until after the war was over ! It is sufficient that it was deemed wise to frame a written Constitution, with a grant of such powers to the Confederate States as are supposed to be ample enough to meet the emergency of the invasion and carry us through the war. That Con-, stitution has been adopted and we are sworn to support it.
■ The only authority relied on to support the position that Congress has power to violate its own contract is the decision of his Honor, Judge French, in the matter of Williams.
The question is, does that decision settle the law or should it be overruled ? I am aware that, in the opinion of the Secretary of War'and of his Excellency, Gov. Yance, the decision of a single Judge on habeas corpus questions is only binding in the particular case, and 1 infer, from the fact, that none have filed opinions except Judge Hbatit and *435 Judge French in this instance, that other Judges take the same view, but in my opinion it is also" entitled to the weight of “ the authority ” or “ an adjudicated case,” as settling the law until .-the judgment be reversed or the principal is overruled ; for it is the decision of a tribunal of superior general jurisdiction over the subject without appeal.
The power of a tribunal, having equal and concurrent jurisdiction, to overrule a decision is conceded. It is a judicial function made necessary by the imperfection of human judgment, and must be exercised in order to secure correctness of decision. True, uniformity as well as correctness are to be desired; but the former is secondary, and must yield when it appears that a Court has fallen into error ; and the sooner error is corrected the better, for it will spread and become the source of other errors. Williams vs. Alexander, 6 Jones, 130. On consulting his books, a lawyer is sure to find “cases overruled,” as instances: Stowe vs. Ward, 1 Dev., 57, is overruled by Ward vs. Stowe, 2 Dev. Eq., 509; Wagstaff vs. Smith, 4 Ired. Eq., 1; by Northcot vs. Casper, 6 Ired. Eq., 303; Spruill vs. Leary, 13 Ired., 225; by Myers vs. Craige, Busbee, 169. But the jurisdiction should be exercised sparingly and only when palpable error is shown.. Several circumstances were relied on by Messrs. Gilmer and Boyden, as-tending to weaken the authority of the decision in Williams’ case. It. conflicts with two decisions before, made by his honor, Judge Heath, in the matter of Farmer, decided June, 1863, and in the matter of Ricks, published August. 1863. The opinion in Williams’ case does not show error in either of these ■ decisions, and, in fact, takes no notice of either adjudication. So, there is a conflict, ^nd the decision now to be made, is to settle the difference- between Judge Heath and Judge French, by overruling* one or the other. Greater respect is due to a decision made *436 after full argument, than to one made hastily and without argument. At the time the decision was made by his honor, Judge French, this case waspending, and the hearing postponed in order to have a full argument, and if the first decision be conclusive of the law, it might tend to produce the indecent spectacle of u a race ” as to who should' get the first judgment; and it was stated, on the argument, that in Williams’ case, the writ was, issued, returned, and the decision made on Friday, 29th January, and the opinion filed in time to be sent 40 miles, and published on Monday, the 1st February, showing haste ; or else that the question was prejudged.
Putting these considerations out of view, I take on myself the.owwsof showing ^palpable error. The first thing that strikes any one who reads the opinion attentively, is the fact, that his Honor does not deny, that according to the principles of the common law. " substitution is a contract.” He says not one word about its being a mere privilege— which is the ground on which the matter is put in the President’s message and the debates in Congress ; but yielding that point, and assuming substitution to be a contract, he boldly takes the position — one, which no politician, lawyer’ and Judge had ever before taken — that the government of the Confederate States has power under the Constitution to viólale its own contractin'other words, he avows tie- right of repudiation, and covers his position by setting forth an army of general principles, which he supports by a long list of references'. I shall only notice two of the ea^es cited, being decisions of-our Supreme Court: State vs. Matthews, 3 Jones, 451. The charter of the 'Hank of Fayetteville Jv# not authorize it, in so many words, to issue one dollar jf.Jcs ; had stich been the fact, there would have been no room for construction, and the Court would have decided that the act of the Legislature was void *437 as violating a contract, but such, yras not the fact; the charter authorizes the bank in general terms, “ to receive deposits,” “ discount notes,” and “ issue notes for circulation,” without saying of ivhat denominationand the Court came to the conclusion, that by a fair construction, the power to issue one dollar notes, did not form a part "of the essence of the contract,” but was “ a mere incident ” intended by the parties tó be subject to future legislation . on the ground, that the Legislature will not be presumed from the use of general words, to give up, by a contract, its ■ power to regulate the currency ; but this presumption may be rebutted, by positive proof; that is, by the use of plain and unequivocal terms of contract, as if the charter 'had specified “ one dollar notes,” thereby making the evidence of a contract as positive as. is done by the words used in the act of Congress, in regard to substitution. His Honor, in what purports to be a quotation from the opinion of Pearson, J., does me great injustice. I set out two alternative positions: "is authority to issue small notes, conferred by the charter, as apart of the essence of the contract, with the intention to put it beyond the control of all future legislation ¶” or is it conferred as a mere incident, with the intention, that it should be subject to such limitations as the Legislature might, at any time thereafter, deem expedient dc. — he does not set out both of these positions, or either of them, but confounds them together ; takes the words, “ as a part of the essence of contract,” from the first, and substitutes them into the second, in place of the words, " as a mere incident,” which he omits, and this mars the sense and makes nonsense of it, and represents me as saying : the authority to issue small notes is conferred by the charter, “ as part of the essence of the contract, with the intention that it should be subject to future legislation,” and that this is so plain that a mere *438 statement is /sufficient to dispose of it. I must be allowed-to object to this-mode of treating tbé opinion of Judges. McRee vs. Wilmington and Raleigh Rail Road Co., 2 Jones, 186. The statement made by his Honor, keeps in the back ground the prominent fact on which the case turns, that the structure — a bridge erected by the Company — was a mere continuation of the road across the river no toll was ever received on it as a bridge, and it w.i-s used in every respect as any other part of the road, and the decision is put on the ground, that a structure or bridge of this sort was not in contemplation of the parties in 1776, and was not embraced by the contract.' As bis Honor admits substitution to be a contract, I am unable to see how these cases have any application to his position, that the government may violate its own contract. I have not examined the many other references ; indeed, it is unnecessary, for T concur in the correctness of “ the general principles,” in support of which they .are cited ; and the labor and research bestowed on these general principles only tend to prove that no case can be found to support the particular position on which his decision rests.
In support of tisis position his Honor takes two grounds :
1. There is nothing in the Constitution of the Confederate States which prohibits Congress tc pass laws violating the obligation of con tracts, though such a power is’denied to the several States,” therefore,' Congress pray violate its own contract — a non se/piifur. 'The important distinction, that the States have all legislative powers, except such as are prohibited, whereas Congress has no power except it be conferred by the Constitution, is entirely overlooked. As the States have all powers, except such as are prohibited, a prohibition in' regard to the States was necessary. As the Confederate States has no power except it be conferred by the Constitution, a prohibition in regard to *439 the Confederate States was unnecessary ; all occasion for' a* prohibition is superceded by tbc article which provides — ■ “>* The powers not delegated to the Confederate States, by the Constitution, nor prohibited by it to the States, are reserved to the State's respectively.” So, the conclusion drawn from the absence of a prohibition in respect to the Confederate States, is illogical and palpably erroneous.
2. if The Congress-shall have power to raise and support armies, to make rules for the government of the, land and naval forces,” and is to .make all laws which shall be necessary .and proper for carrying into execution the foregoing powers, and all other powerá'vested by this Constitution in the government of the Confederate States in any department or officer thereof.” •
The reasoning is this : the .act of Congress conscripting men who have put in substitutes, is necessary and proper to carry into effect the powor to raise armies, therefore, Congress lias power to violate its own contract; a non se~ qv.ilv,r. His Honor,fails to take into consideration the fact that the supposed necessity is caused by the acts of Congress which allows substitution as to conscripts, and the actmfthe Secretary of War, Oct.-20th, 1861, which allows substitution as to volunteers. - He fails to consider that the clause to make all laws which shall be necessary and proper for carrying into execution the powers conferred by the Constitution has never before been supposed to be a grant* of a general substantive poioer, but is confined to the means of giving effect to the powers already Conferred, and is merely the expression, out of abundant caution, of what would have been implied,‘and he fails to consider that the word “ proper ” is added to the word “ necessary;.so the measures adopted must be both necessary and proper, and certainly, however great the necessity may he, it never can be proper for 'the government to violate its own, con *440 -tract; and he fails, to consider’the consequences to which his doctrine leads, nothing more nor less than this : Congress has' power to do whatever it pleases, in order to raise and support an army ! ! ! It may repudiate its bonds and notes now outstanding, a renovated currency being necessary to support the army, or it may conscript all ivMie women between the ages oí 1G and 60 to cook and bake for the soldiers, nurse at the hospitals or serve in the ranks as soldiers, thus uprooting the foundaíions oí society ; or it may •conscript the Governor, Judges and Legislatures of the-several States, put an end to “State Rights,” and erect on the ruins a “ consolidated militarv despotism.”
So the fact of subjecting principals of substitutes to military service sinks into insignificance.when contrasted with the consequences to which the grounds on which the decision is put. must lead, and for which the decision, if not overruled, may be cited as authority. I am convinced, then, there is not only palpable error in this second ground hut it is destructive of society aud subversive of our Constitution. For these reasons I do not consider the case of "Williams as an authority, and, for tíre reasons above stated, I have the clearest conviction that Congress has not, under the Constitution, power to pass the act in question, and feel.it to he my duty to declare that,, in my opinion, it is void aud of no effect.
No one can regret the necessity for this conflict of decision more than I do. What is to he its- effect, is for the consideration of others. It may he to leave the law unsettled, and that a r‘ judgment of discharge,” on. habeas corpus,, will, as heretofore, he treated as binding only in the particular case. I'suggested to Gov. Vance to meet a condition of things like the present, the propriety of calling the attention of the Legislature, at its last session, to the expediency of amending the law so as to allow appeals iff *441 Ifidbeas corpus cases, and make it tlio duty of the Chief Justice, tinder certain circumstances, to call an extra term of the Suprenjo Court. No action was taken'by the Legislature., So, I have no power'to call a term of the Court, and the other two Judges concur with me in the opinion, that as the Supreme Court has jurisdiction, the law does not authorize a convocation of all of the Judges in vacation. My ¡duty is plain, to decide the cases before me, according, to the best of my judgment.
I must be permitted to express my obligation to the learned counsel, Messrs. Bragg and Kittrell, who-argued on the side of the government, and Messrs. Gilmer, Boyden, Scott and Caldwell, who argued on the side of the petitioner, and Messrs. Moore and Fowle, who filed written arguments, for the assistance they have rendered me. I feel that I have heard all that can be said on both sides of the question ; and, if I have failed to arrive at a correct conclusion, it is because the power of judgment with which nature has gifted me, aided by a life-time study of tire principles of the law' does not enable me to make legal deductions.
I will add, that the pains taken by the officers of the government to have the question fully argued before a judicial tribunal, affords a grateful assurance of a desire to have* the rights of the citizen ascertained • and protected by an adjudication according to the Constitution and laws.
It is, therefore, considered, that E. S. Walton be forth- \ > with discharged.